IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 1:25-CR-287 |
| | ) | |
| MIRZOBEK BEKMURATOV, | ) | The Hon. Rossie D. Alston Jr. |
| | ) | |
| Defendant | ) | Sentencing: September 16, 2026 |
| | ) | |

**UNITED STATES' POSITION ON SENTENCING**

The United States of America, by and through its undersigned counsel, hereby submits its position on the sentencing of Mirzobek Bekmuratov (the "defendant" or Bekmuratov). On April 15, 2026, Bekmuratov pled guilty to Count 1 of an Indictment charging him with Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h). The applicable guidelines range should be 37 – 46 months. The current calculation does not include a two-level minor participant reduction, resulting in an offense level of 21. The United States submits that there is no basis for a variance below that guideline range and a sentence of 40 months is sufficient but not greater than necessary to effectuate the statutory sentencing factors under 18 U.S.C. § 3553(a). The Court should further impose supervised release, forfeiture and a special assessment as set forth by statute.

## I. THE DEFENDANT JOINS A CONSPIRACY TO DEFRAUD AND LAUNDER THE PROCEEDS OF HIS CRIMINAL ACTIVITY FOR TWO YEARS

As alleged in the Complaint sworn on September 16, 2025, from August 2023 through September 2025, Khamza, Karimov, Bekmuratov, and a selected group of coconspirators engaged in a veritable cornucopia of related criminal conduct and laundered the proceeds of these activities. While awaiting sentencing, and then serving a sentence for supervised release for

Hobbs Act Extortion in the Eastern District of New York, Bekmuratov joined the charged scheme on or about June 2023 when Khamza sought to facilitate the illegal travel of an individual referred to in the Complaint as C-19 into the United States – along with at least 29 others. *See* Exhibit A at ¶¶ 34-35. Khamza worked with Mirzobek Bekmuratov and an individual referred to in the complaint as C-5 to fund and facilitate this human smuggling operation by purchasing plane tickets and sending money out of and through the United States. *See id.*; *see also* Exhibit B; Exhibit F. When C-19 was caught attempting to enter the United States without documentation, he provided Khamza's contact information to the Department of Homeland Security prior to being paroled. *See* Exhibit B; *see also* Exhibit F at 3-4.

As noted above, this was not Bekmuratov's first criminal act. On July 20, 2021, Bekmuratov was charged in the Eastern District of New York with Conspiracy to Commit Hobbs Act Extortion. *See* PSR at ¶ 67. This charge arose from Bekmuratov's association with the KavKaz criminal enterprise – a Brooklyn-based organization involved in narcotics trafficking, robbery, extortion, fraud, the transportation of stolen property, violence, and money laundering. *Id.* A ranking member of KavKaz, named Nikoghosyan, and Bekmuratov threatened two victims with violence if they did not repay debts to Nikoghosyan. *Id.* Bekmuratov coordinated the transfer of payments to Nikoghosyan via cash and electronic payment services. Bekmuratov and Nikoghosyan also participated in a scheme to move stolen vehicles from California to New York. *Id.* On September 17, 2024, a sentence of four years of supervised probation was imposed by the Eastern District of New York. *Id.* Bekmuratov's criminal conduct in this case occurred both before and after his sentencing for this offense on September 17, 2024. *Id.*

On December 22, 2024, FBI personnel observed Khamza, Bekmuratov, Karimov, and others meet at a restaurant in Brooklyn. Over the next two days, Khamza abused a Bank of

America policy that immediately credited accounts with the full value of deposited checks when the check was for less than $1,000. *See* Exhibit A at ¶ 31; *see also* Exhibit C. Khamza deposited 89 of these fraudulent checks into a Bank of America account associated with his shell company, JNB Trans. *See* Exhibit C. Each of these checks was for less than $1,000. *See id*. In total, Khamza caused $87,922 to get deposited into his Bank of America JNB Trans account. *See* Exhibit A at ¶ 31. The company that allegedly wrote those checks did not exist and its address comes back to an intersection in a residential Alabama neighborhood. *See* Exhibit C. Soon after these funds were deposited, Khamza withdrew them to other accounts before Bank of America could recognize and correct the abuse. *See id*. Khamza sent $12,475.00 of this stolen money to a CashApp account containing his previous name – Javokhir Norkobilov – and $3,500 to Bekmuratov. *See* Exhibit A at ¶ 31; *see also* Exhibit C. Khamza also transferred $12,000 to a Bank of America account held by Bobir Bekmuratov – the defendant's brother – on December 26, 2024. *See* Exhibit C.

Records from MGM Casinos at National Harbor, Maryland, and Atlantic City, New Jersey, show that Karimov gambled at one of those two locations every day from December 23 through 30, 2024, three days between January 1 and 20, 2025, and every day from January 20 through 24, 2025. *See id.* at ¶¶ 8, 32. During some of those trips, Bekmuratov accompanied Karimov. MGM's records show that Karimov obtained gambling chips worth a total of $342,217.50 and "cashed out" a total of $333,857.50 during this time period. *See id.* at 32. At this time, neither Karimov nor Bekmuratov had a reported source of legitimate income large enough to justify entering a casino with over $340,000. They did, however, have at least one criminal associate – Khamza – who obtained a significant windfall via the recently completed Bank of America check fraud.

The above activities explain why Bekmuratov agreed to help Khamza launder the CHS's money on March 4 and 5, 2025. He knew and trusted Khamza and believed he could profit from helping the CHS transfer $100,000 into the USDT cryptocurrency and move those funds overseas. The United States has no evidence showing that Bekmuratov knew what criminal activity the CHS claimed to be facilitating, but Bekmuratov's recorded statements show he knew this activity was money laundering and illegal.

Specifically, after the transaction on March 4, 2025, fell through, Bekmuratov and the CHS had the following exchange:

| | |
|---|---|
| MB: | [OV] Understand. Cause they're scared. This is fucking. They can easily get locked up for this shit. It's money laundering. |
| CHS 1: | Yeah. Yeah. |
| MB: | That's why they don't work with nobody but Jews. |
| CHS 1: | Okay. |
| MB: | That's why you see, even on the phone he says give the money… |
| CHS 1: | [OV] Well what is he scared of, I mean like if I just give him the money that would be the scary part. You know what I mean? its just... |
| MB: | [OV] No the thing is I told you. This is… counts like a money laundering. He can get set up. |
| CHS 1: | I see. |
| MB: | It's not like… Maybe somebody come with a fucking microphone whatever. You don't know like cause… |
| CHS 1: | [OV] Yeah. |
| MB: | [OV] ..You deal with like people… |
| CHS 1: | [OV] Yeah. |
| MB: | [OV] ...And you don't know… |
| CHS 1: | [OV] Yeah. |
| MB: | …Who's what. I got set up by my best friend for eight years one time. My best friend for eight years, he came with a… He got locked up for something else. He came with a fucking thing, he set me up. |

Exhibit D at 29-30. Bekmuratov also claimed that he did "millions of dollars" of this type of activity and attempted to launder an additional $10,000 while helping the CHS try to launder his/her $100,000. *See id.* at 10, 13.

This was the last time the CHS interacted with Bekmuratov. But it was not the last time Bekmuratov participated in this scheme. On April 24, 2025, Kazi Haidar Ali ("Ali") helped the CHS and Khamza convert another $100,000 in cash into the cryptocurrency USDT. Ali was charged separately for this conduct. Ali only met with the CHS and Khamza and completed the transaction for them because of an extensive and separate criminal relationship with Bekmuratov. *See* Exhibit E, subpart A. Bekmuratov also has a history of acting as a broker to facilitate numerous off-the-books cryptocurrency exchanges. *See* Exhibit F at 1-3.

## II. STATUTORY PENALTIES AND GUIDELINES CALCULATIONS

Conspiracy to commit money laundering has a statutory maximum of twenty (20) years' imprisonment, a fine of $500,000 or twice the value of the property involved, three years supervised release, and a $100 special assessment. *See* 18 U.S.C. § 1956(h).

### <u>Combined Adjusted Offense Level</u>

As the Court is aware, although the Sentencing Guidelines are advisory, a sentencing court "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Thus, at sentencing, a court "must first calculate the Guidelines range" applicable to the defendant. *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007). The United States calculates the offense level and adjustments as follows:

| **Guideline** | |
|---|---|
| The base offense level is 8, plus the number of offense levels from the table in § 2B1.1 corresponding to the value of the launder funds. (U.S.S.G. § 2S1.1(a)(2)). The loss was $573,052.00 – exceeding $550,000 but less than $1,500.000. This is a 14-level increase. (U.S.S.G. § 2B1.1(b)(1)(H)). | 22 |
| If (i) subsection U.S.S.G. § 2S1.1(a)(2) applies; and (ii) the defendant was in the business of laundering funds, increase by 4 levels. (U.S.S.G. §2S1.1(b)(2)(C)). | +4 |
| Total Offense Level | 26 |
| U.S.S.G. § 4C1.1(a) and (b) adjustment | -2 |
| USSG §3E1.1(b) additional downward adjustment | -1 |
| Minor Participant Reduction (Agreed to if the full amount is applied) | -2[1] |
| Adjusted Offense Level | 21 |

Bekmuratov objects to: 1) the loss amount computation; 2) the inclusion of PSR paragraph 42; 3) the inclusion of PSR paragraphs 43 – 46 4) Bekmuratov being responsible for the full loss amount of the conspiracy and not receiving a role reduction; 5) the inclusion of PSR paragraphs 22 – 24; 6) the inclusion of PSR paragraph 25; and 7) the inclusion of PSR paragraph 48.

## I. The Loss Amount (Objection 1), the Inclusion of Paragraph 42 (Objection 2), and the Inclusion of Paragraphs 22 – 24 (Objection 5)

The parties disagree about Bekmuratov's role in the charged criminal conduct and the loss amount. *See* U.S.S.G. § 2S1.1(a)(2). Bekmuratov contends that his relevant conduct and loss amount only consists of the money he attempted to launder on March 4, 2025. This is alleged as Count 3 of the Indictment. However, Bekmuratov's relevant conduct includes at least all the money laundering transactions alleged in Counts 2 through 7 of the Indictment, which are part of the conspiracy Bekmuratov acknowledges he joined.

Paragraph 10 of the Statement of Facts – which both parties agreed to – states: "[the statement of facts] does not include each and every fact known to the defendant or to the United

[1] The United States agreed as part of facilitating the plea that if Bekmuratov was held accountable for the full loss amount of the conspiracy it would not object to a minor role reduction.

States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case." Statement of Facts at ¶ 10. In the same vein, relevant conduct for purposes of a Guidelines calculation requires a broader analysis. Pursuant to USSG § 1B1.3(a)(1)(B), a co-conspirator is liable for "all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." The Application Notes for the Guideline explain that:

> In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.

U.S.S.G. § 1B1.3, cmt. n.2.; *United States v. Turnbull*, 387 F. App'x. 322, 325 (2010) ("[D]efendant's lengthy and extensive involvement in the scheme permitted the inference that she was specifically aware of its scope and that the amount of the fraud was reasonably foreseeable to her.").

The most complete enumeration of the facts surrounding Bekmuratov's case can be found in the criminal complaint sworn by Special Agent Hagenbaugh. This document outlines the extensive criminal scheme that probation correctly discussed in the PSR. A clear pattern emerges when all the offenses described in the PSR above are considered together. From 2023 until 2025 the same set of individuals (Khamza, Karimov, Bekmuratov, and others) committed a series of similarly structured thefts and frauds. To understand this pattern and the individuals involved, the summaries provided in PSR paragraphs 22 through 24 provide critical context for the nature of the conspiracy and the motivations of the conspirators.

Bekmuratov's immediate recognition of the full scope of the CHS's money laundering scheme and the fact that it was criminal only makes sense when it is placed in the context of Karimov, Bekmuratov, Khamza, and Ali's other criminal operations. Because Bekmuratov previously laundered money with Khamza and Ali and worked closely with Khamza and Karimov, he was: 1) immediately receptive to helping the CHS at Khamza's request; 2) open about the fact that he knew the transaction he was facilitating was "money laundering;" 3) willing and able to find another party when the March 4, 2025, transaction was not completed; and 4) connected Khamza with Ali to facilitate the April 24, 2025, transaction for the CHS. *See* Exhibit A at ¶¶ 2, 20-21, 31-35, 69-72; *see also* Exhibit E. From this vantage point, the conduct in the Statement of Facts and Indictment is just a piece of a larger interconnected set of criminal activity that was reasonably foreseeable to Bekmuratov. *See* U.S.S.G. § 3D1.2(d).

After the March 4, 2026, transaction was not completed, Bekmuratov offered to find the CHS someone who could comply with the CHS's procedural requests. *See* Exhibit D at pp. 28 – 30. Later, Bekmuratov connected Ali with Khamza so Khamza could facilitate another transaction for the CHS. *See* Exhibit E, subpart A. Bekmuratov knew the CHS had lots of money that needed to be laundered, was continuing to seek a person to assist him with laundering it, and even used (indirectly through Khamza) Bekmuratov's services again. *See id*. Thus, under U.S.S.G. § 2B1.1's framework, the Court should consider all of the CHS and Khamza's money laundering activity as part of the same course of reasonably foreseeable conduct and should be considered in the Court's offense level calculation.

Finally, as referenced above, Bekmuratov was the one who told Ali to help Khamza launder funds for the CHS on April 24, 2025. So, there are two instances where Bekmuratov knowingly helped Khamza launder money for the CHS – March 4, 2025 (described in the

indictment and complaint) and April 24, 2025. At a minimum, that makes the base offense level +18 (2B1.1(b)(1)(F)($150K<$250K)), but these two transactions and the larger relationship make it clear that it was reasonably foreseeable to Bekmuratov that this charged conspiracy included hundreds of thousands of dollars in illegal funds. *See* Exhibit D at pp. 28 – 30; *see also* Exhibit E, subpart A; Exhibit F at 1-3.

**II. Role Reduction (Objection 4)**

The United States does not object to the position that the defendant was a minor participant in the full conspiracy, which laundered $573,052.00, pursuant to U.S.S.G. § 3B1.2(b). However, the United States reserves the right to argue that Bekmuratov is not eligible for a mitigating role reduction if the Court finds he was only responsible for Laundering approximately $100,000 on March 4, 2025.

Although eligible for a minor participant reduction given the present posture, Bekmuratov is not a minimal participant as defined in U.S.S.G. § 3B1.2(a). In considering a role reduction, the Court can evaluate (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning or organizing the criminal activity; (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (5) the degree to which the defendant stood to benefit from the criminal activity. U.S.S.G.§ 3B1.2 Application Note 3(C).

As outlined above and discussed further below, Bekmuratov is deeply ensconced in Khamza's criminal operations and knew the scope of this scheme when he participated in it. He

assisted Khamza and the CHS with laundering the CHS's money on at least two occasions approximately six weeks apart. On both occasions he helped select and facilitate the CHS's connection with the money laundering network Khamza and the CHS used to convert the CHS's money into cryptocurrency. Bekmuratov told the CHS that he believed they were engaging in "money laundering" and could get "locked up" for what they were doing at the end of the March 4, 2025, transaction. *See* Exhibit D at 29-30.

In addition to working with Karimov to launder, through gambling, the proceeds of Khamza's Bank of America check fraud scheme, Bekmuratov also engaged in multiple money laundering schemes with Khamza and Ali. *See* Exhibit D. This indicates Bekmuratov understood that the CHS could potentially be bringing him hundreds of thousands, if not millions, of dollars in dirty money. *See* Exhibit D at 10; *See also* Exhibit F at 1-3.

**III. Striking Paragraphs 44 – 48 (Objections 3 and 7)**

The conduct described in paragraphs 44 – 48 should remain part of the PSR as "other relevant conduct" because it is necessary to assist the Court with evaluating the sentencing factors described in 18 U.S.C. § 3553(a). It is not, however, conduct relevant to the charged conspiracy. The ATM break-ins, stolen beef shipment, lease fraud and AirBnB rentals, and stolen vehicles, are clearly part of the defendant's history and characteristics. *See* 18 U.S.C. § 3553(a)(1). These activities shed light on why a guidelines sentence of 40 months is necessary to protect the public from the defendant, *see* 18 U.S.C. § 3553(a)(2)(C), and gives important context for the seriousness of the charged conspiracy, *see* 18 U.S.C. § 3553(a)(2)(A) and (B).

**IV. Paragraph 43 (Objection 6)**

The United States has messages from Khamza instructing Bekmuratov to arrange and pay for the travel of an individual referred to in the Complaint as C-19 and at least 29 others into the

United States. *See* Exhibit A at ¶¶ 33-35. Khamza worked with Mirzobek Bekmuratov and an individual referred to in the complaint as C-5 to fund and facilitate the illegal entry of others into the United States by purchasing plane tickets and sending money out of and through the United States. *See id.*; *see also* Exhibit B; Exhibit F at 3-4. When C-19 was caught attempting to enter the United States illegally he provided Khamza's contact information to the Department of Homeland Security prior to being paroled. *See* Exhibit B.

**SECTION 3553(a) FACTORS**

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also* *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

A sentence in the middle of the guidelines range is appropriate to punish Bekmuratov's conduct, promote respect for the law, and deter Bekmuratov and others in the future. This is Bekmuratov's second offense. After pleading guilty to Conspiracy to Commit Hobbs Act Extortion in the Eastern District of New York on July 21, 2021, Bekmuratov got sentenced to 4-years of supervised probation. During that time, Bekmuratov repeatedly met with Khamza and Karimov and engaged in numerous violations of U.S. law. Bekmuratov stole and sold vehicles, engaged in cargo theft, and facilitated a number of Khamza's criminal schemes. The proceeds of this activity, including the schemes described above, were Bekmuratov's primary source of

income. The following bullet points provide more color for the criminal schemes not discussed above:

- Cargo Theft: The FBI identified communications showing Khamza and Bekmuratov worked together to commit cargo theft on August 12, 2025. Khamza and Bekmuratov identified a bid to ship goods from a seller to a buyer on an online platform. They pretended to be the company that won the shipment bid, picked up the goods (beef valued at approximately $137,655), and then stole and resold the goods themselves. *See* Exhibit G.
- Car and Car Parts Theft: As they waited for C-18 on March 5, 2025, Khamza told the CHS that one of his schemes was moving car parts from Miami to Dubai. He did not explain how he lawfully purchased or shipped these parts. The United States did not find any evidence of car parts being stolen and shipped, but did find audio notes and messages in Khamza's phone showing that individuals asked Khamza to obtain specific vehicles. As these orders came in, Khamza would work with Bekmuratov and Bekmuratov's brother to facilitate the theft of these cars. *See* Exhibit H.
- ATM Theft and Credit Card Skimmer: A text and audio exchange from September 2023 between Khamza and Bekmuratov begins with Khamza suggesting that the two should start stealing from a specific model of ATM machine. Similarly, on a separate occasion, Khamza sent Bekmuratov a video showing how a credit card skimmer operated. Although these schemes never came to fruition, they are an example of Khamza's desire to keep searching for new sources of illegal revenue and see if Bekmuratov was interested in joining those schemes. *See* Exhibit I.

As shown by the above conduct and the facts underlying Bekmuratov's conviction, he, Khamza, and Karimov used their experience and criminal acumen to steal and defraud victims, and worked together to launder the proceeds of these activities. The Bank of America fraud exploited a flaw in a major bank's check cashing policy and Bekmuratov accompanied Karimov as Karimov likely laundered these stolen funds through two MGM casinos. Relatedly, when Khamza needed money moved outside the United States to help Uzbek nationals enter the United States illegally, he enlisted Bekmuratov's assistance.

This criminal activity, which was committed while Bekmuratov was either awaiting sentencing or still on probation for conspiracy to commit Hobbs Act extortion, makes it clear that Bekmuratov knew exactly what he was doing when he helped the CHS launder money on March 4, 2025, and April 24, 2025. A sentence of 40 months (a mid-range guidelines sentence) accounts for Bekmuratov's criminal history, his contribution to the charged money laundering conspiracy, and the danger his repeated and wide-ranging criminal behavior poses to the community.

## III. SUPERVISED RELEASE

The Court must also determine the appropriate term of supervised release at sentencing. Bekmuratov's extensive criminal conduct makes three years of probation necessary to ensure he does not rejoin or attempt to reestablish this criminal network. *See* U.S.S.G. § 5D1.1(b). Bekmuratov's role and time within this extensive criminal scheme makes it likely he will rejoin after serving his sentence. A prolonged period of supervised release would likely provide Bekmuratov with the necessary structure to avoid falling back into participating in these schemes.

**CONCLUSION**

For the reasons stated above, the United States respectfully requests that the Court impose a term of 40 months imprisonment, three years' probation, the mandatory $100 special assessment, and forfeiture as stated in the United States' motion for forfeiture.

Respectfully submitted,

TODD W. BLANCHE
ATTORNEY GENERAL

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED STATES ATTORNEY

By: /s/
Jacques Singer-Emery
Special Assistant United States Attorney

Gordon Kromberg
Assistant United States Attorney
Eastern District of Virginia